We'll hear the first case on calendar, United States v. Galizia. Good morning. Good morning, your honors. May it please the court, my name is Allegra Glashauser and I represent Mr. Galizia. Your honors, Mr. Galizia was on trial for illegally re-entering the United States, but his defense was derailed with unanticipated questions about a dismissed case that was sealed because there was a lack of evidence, a 20-year-old conviction, his prior arrests, and the facts of a petty larceny case that were presented in a way that made it seem that Mr. Galizia was lying. Each of these types of evidence on their own was prejudicial and unduly so. Together they were devastating. Are you gonna limit yourself to the ones that were objected to? Your honor, they were all objected to. All four of these types of evidence were objected to. It was not an objection to asking the witness whether the police officers were lying, the agents were lying, and I think I counted up a total of seven different people were lying, even though there are two Second Circuit cases and cases in many other circuits saying that's been raised on appeal. Your honor, that was part of this testimony that was objected to vigorously about these forgery charges, and then you're right, the prosecutor summed up that section. One piece of it was about, one of those lying questions was whether the old man with Parkinson's disease was lying, but the rest was not. None of the questions about is someone lying were objected to. Your honor, if you see more errors that were unobjected to, by all means throw them on the pile as a reason to overturn this conviction. I think, as your honor's questions indicate, there were a wealth of questions to undermine Mr. Gleitz's credibility, and they weren't appropriate questions. I think that the forgery questions were the most extreme. They went on for about 20 separate questions, and those allegations were, it wasn't just allegations that were dismissed because the prosecutor didn't feel like continuing with the case for some reason. They were dismissed because the NYPD handwriting expert determined that they couldn't prove there was a forgery, that there may not have been a forgery, that no crime may have been committed. I was somewhat confused about what was and was not before the district judge about that subject. Can you enlighten me at all? Well, my understanding is that the district judge didn't understand that the reason the case had been dismissed was because of this handwriting expert at the NYPD determining the forgery hadn't been created. And that kind of explains one reason why this error happened. I mean, she said something like that in the post-trial opinion. I wasn't clear about, when you say, well, she didn't understand, was that because she just didn't pick it up, or was that because it wasn't disclosed? Your honor, I'm not a hundred percent sure on that question. What I do know is that this conversation about whether these allegations should be admitted happened in a very rushed manner. The government didn't ask to bring it up until after Mr. Galitsa's direct testimony. And the court makes clear that it's very rushed because a juror needs a break, it's the end of the day, and things do not happen as they normally should in federal court, where it's all laid out for the court. The government gets the date wrong about the conviction, I'm sure inadvertently, and tells the judge, assures the judge, that it just falls under the decision she already made. And none of that is true. She had not ruled on this case, which is different than the others, and significantly different also because it was dismissed for lack of evidence. Even if these were errors, though, isn't the evidence of guilt so overwhelming here? I mean, there's evidence that he got on the plane, that immigration witnessed his departure, that he was received in the Ukraine, the credit cards used in the U.S. on one day and in the Ukraine on the next. I mean, that's overwhelming evidence of guilt. How can these errors have affected that at all? Because Mr. Galitsa's testimony was the entire crux of the defense. The government's case relied on paperwork, and it relied on agents testifying about their normal practices. And his testimony is that because these agents liked him, they let him go. That's his story, right? Essentially, because they liked him, they said, you know, you're supposed to be deported, but we're going to look the other way, and you can take off. His testimony was that over the many hours that they spent together between his two flights, that the agents took him out for food, that they went on some errands, which the agents did testify, they do, and that at the end, they did not deport him. That question of whether his testimony on the actual facts of what happened that day was the issue before the jury, and the jury should have been watching Mr. Galitsa testify? That's not the question that was asked. The question is whether that matters when you've got a documentation such as the use of his credit card in the United States one day, and in Ukraine the next, and he says he was not deported, and the credit card was used all over Ukraine. And then nicely comes back to the United States across Europe before he shows up again in the United States. And one last thing, and he says he mailed the credit card, and yet it's one day in the United States, the next day in the Ukraine, so that's awfully fast mail. Your Honors, I'm not saying that the government's case was weak, but what I'm saying is that the only person who had any memory about what happened this day was Mr. Galitsa. You know, if the agents had testified that out of all the people they put on planes since the date of this deportation, they specifically remembered Mr. Galitsa, and they specifically remembered putting him on the plane, I would find that somewhat surprising, and possibly even indicative of dishonesty. You know, you made the point they only testified to their normal practices, but if they had made an exception to their normal practices, I'm sure they would remember releasing somebody. So, you know, the credibility of their denial that they ever did this is really what's at issue for the jury, right? I mean, this could not have been, oh yeah, we let this guy, maybe let this guy go, but who would remember that? I don't remember doing anything like that. They denied ever doing anything like that. So there's really pretty straightforward testimony on the part of the agents that this didn't happen. You know, the standard for harmless error— You don't have to believe it. I'm not saying you're required to believe what the agents said, but it seems to me it's quite tantamount to a specific denial. I think it is different than if they remembered Mr. Galitsa, but I also think that the standard before the court on this kind of error, to find that it was not effective, to find that it did not affect the judgment. There's actually a Ukraine entry document. It's not only that he's on the passenger manifest from the airplane, there's also an entry document showing his entry to Ukraine on the flight that he says he wasn't on. I believe they were actually, he wasn't, they did not have the passenger manifest list because the airline did not, had gone out of business since, and they had no passenger manifest list. They did have the entry from the Ukraine. They did not have the return entry. There were holes in the government's case, which the defense should have been able to take advantage of. What do you mean the return, what's, what do you mean the return? They had no, they had no documents showing his return to the United States. You mean he— If he left, he had to have returned. You mean he might have sneaked in? Well, it's difficult to sneak in by airplane, but— Indeed, it happened, Mr. Galitsa managed to do that a couple of times, right? Didn't he cross the border, the southern border a couple of times before this? He had a couple of illegal re-entry cases before this. And to do an illegal re-entry, it doesn't make sense to arrive at JFK airport. At least not under your own name. Yeah. You earlier said that forgery had, that there was testimony that forgery had not been committed. My memory is that the expert was unable to say whether there was a forgery or not, which is quite different. The expert was unable— There was an opportunity to question in good faith whether this forgery took place. I mean, there was a vulnerable person who was in his right mind, but vulnerable. And your client charged a fantastic amount of money for house renovations unless he was stealing it and forging it. The evidence shows that at all, Your Honor. The government asserted that he charged too much money for home renovations, which certainly doesn't seem fantastic to me in New York City, that your home renovation could cost that amount of money. Fair point. But that does provide, in the context of everything else, including the victim's experience, that there was fair ground for asking about that. I completely disagree, Your Honor. This court has explained in Schwab that in the context of an acquittal after a charge, to ask questions about the underlying accusation— What do you mean an acquittal? I mean, he was not tried. Right. He wasn't even tried because the government didn't believe it could prove a case. It thought there wasn't— That would be the standard for an acquittal as well, though, right? Sure. But I believe it's rare for the government to drop a case because they don't have the evidence. It's at least as equal as an acquittal for the government to have dropped the case in terms of the potential probative value by asking questions. If the jury actually acquitted him, it would still only be the case that it was not proved beyond a reasonable doubt. And we said in Schwab that under those circumstances, the probative value is much reduced. Not only much reduced, it's essentially— But reduced to the point where the court said it would not be appropriate to introduce. And your point is if the government acknowledges, the prosecution acknowledges that they can't prove the case beyond a reasonable doubt, your argument is that's tantamount to an acquittal. Correct. And the facts that Judge Jacobs points to about the person being vulnerable, about how much money is stolen— It's easy to steal from people who are vulnerable. It's easy to convict somebody if you think that they have also stolen $25,000 from a vulnerable, elderly, sick man. The prejudice from those questions, which were numerous, was exceedingly high here because of those facts. You've reserved some time for rebuttal. Thank you. Thank you, the government. May it please the Court. My name is Michael Kraus. I'm an assistant United States attorney in the Southern District of New York. I represent the government on this appeal, and I represent the government at trial. Your Honor, the district court did not err or abuse its discretion in its evidentiary rulings in this case. Let's start with the burglary conviction in 1996. The government's theory as to why that became admissible was that the defendant opened the door to it by saying that the first time he left the United States was in 2004. That's the theory, right? Yes, Your Honor, that he left the country in 2004, and that he applied for a visa in 2005, and that visa was denied. Let's assume that it's quite reasonable—I'm not sure, but it's certainly within the district court's discretion—to say that the fact that he was deported corrects a misimpression that he just left under his own steam. What is added to correct what misimpression by emphasizing that it was a conviction that led to his deportation? What other than the prejudicial impact of identifying a 1996 conviction that, in itself, the court had already ruled was not admissible on cross? Yes, Your Honor, and the fact that the conviction was admitted but not the underlying— Yeah, so what—tell me what—my question is, what is—what misimpression is corrected by adding to the fact that he did not leave voluntarily, that he was deported, by adding the fact that he was deported as a result of a criminal conviction? The government's argument was that because Mr. Galitz had left the impression with the jury that he voluntarily left the country— You didn't leave voluntarily. You were deported, right? Right. And the government's argument was that the reason for the deportation was relevant— Why? Explain it to me. It was relevant, Your Honor, to—Your Honor, at the time of the testimony, it appeared that Mr. Galitz was minimizing the reasons for why he left the country. But we resolved that, didn't we, by saying he was deported. So that's—that misimpression that I just happened to go home to Ukraine for a visit is corrected by saying, no, you didn't. You were deported from the United States. So what—explain to me still what is added to correct what misimpression by alluding to a criminal conviction that is otherwise not admissible and is otherwise prejudicial. Your Honor, it would beg the question why he was deported. So the government simply asked that the government be able to, or the defense in this case, would be able to elicit that fact. And once that ruling was made, the defense was allowed to reopen and itself correct the misimpression. Yes, Your Honor. And that was done. Yes, Your Honor. And then still on cross-examination, there were five different questions, admittedly helped along by Mr. Galitz's quibbling a little bit, each of which emphasized the word conviction. And the whole thing was started out with, weren't you arrested for—in effect for—not for— weren't you arrested was the introduction to that line of questioning on cross. So I'm having a little trouble understanding why it is either appropriate for the government or a correct ruling by the district court to allow in the fact of conviction. Your Honor, it may have been an incorrect ruling, but it was not an abuse of discretion. The government at the time believed that— Did the government ever explain why, to the judge, why the conviction aspect of this was relevant? Was that ever even considered by the district judge as a separate aspect of this ruling? I don't believe so, Your Honor. I believe that the admission was to correct the record, to correct any misimpression that was left by the defendant's testimony, and the government asked for that. The alleged forgery, the reason this gets in is because forgery shows dishonesty or mendacity, right? Yes, Your Honor. If you forge checks of an able-bodied youthful person, is that more or less mendacious than forging checks of somebody who happens to be elderly or disabled? Yes. Yes, Your Honor. I believe so. The fact that the victim was an elderly man shows a targeting of a vulnerable individual. It shows that he's cruel. It shows that he's a nasty fellow. Does it show anything more about dishonesty? It could show more about dishonesty in that a dishonest person would— A dishonest person— Sorry. A dishonest person might be so dishonest that he would cheat an elderly person, and that's more dishonest than somebody who cheats somebody else. That he would target a more vulnerable individual, yes, Your Honor. And on that point, the government had a good-faith basis to ask about those checks. How do you deal with Schwab, where we said that in a situation where someone has been acquitted of a charge, that inquiring about the underlying conduct is highly problematic, and indeed, in Schwab, was a basis for overturning the conviction? Well, Your Honor, in Schwab, the conviction was not overturned because the error was deemed to be harmless. Harmless. But there are two ways to distinguish— It was certainly said to be error, not just that it was—that's something to take into account. It was said to be error. Certainly, Your Honor. And there's two ways to distinguish Schwab here. Obviously, the first way is touched on in the conversation with the defense counsel. Here, Mr. Galitsa was not acquitted of that conduct. It was a dismissal by the Manhattan DA's office based on proof issues. Based on proof issues. It was more than proof issues, right? It was the fact that their handwriting experts said it's not a forgery. The handwriting expert did not say it was not a forgery, Your Honor. The handwriting expert said he could not conclusively determine that it was a forgery. Okay. But he didn't go so far as to say this is not a forged indictment. Okay. Isn't that — I mean, so therefore, there's reasonable doubt. Therefore, the guy would have gotten acquitted had the case gone to trial. Therefore, under Schwab, this proof shouldn't come in. Possibly, Your Honor, he would have been acquitted. But the point is there was no acquittal here. The other way to distinguish Schwab is— It's even stronger than no acquittal, though, isn't it? If the prosecutor decides that there's not enough of a case to even go forward, that's even stronger than having an acquittal, isn't it? No, Your Honor. An acquittal is a determination that the government has not been able to prove the case beyond a reasonable doubt. A dismissal is the government's determination that they possibly would not be able to prove it beyond a reasonable doubt. But the other way to distinguish Schwab, Your Honor, is that in Schwab, they said the prosecution had no information in its possession to indicate that Schwab was guilty of the offense. There was no further inquiry done. Here, the government did do further inquiry into the underlying conduct. So the government reviewed the DA's file, reviewed the bank records, spoke to the victim. The victim stated that he hired Mr. Galitza to do $15,000 worth of renovations to his home. Instead, Mr. Galitza cashed $40,000 worth of checks. The checks were cashed in nonsequential order. The victim stood by the fact that he only gave $15,000. He was of able mind. The fact that a forgery expert was not able to conclusively determine it was a forgery is explained by the fact that Mr. Galitza did have legitimate checks from the victim and had his legitimate signature and could therefore copy that signature on the checks that he stole. So the government had more than a good-faith basis to inquire into that conduct. And the conduct clearly goes to the defendant's credibility. Once the defendant— Just about— Yes, Your Honor. The United States against Estrada next. In Estrada, we held that a conviction for shoplifting was not admissible under Rule 609 because it didn't go to deceitfulness, a somewhat peculiar decision, perhaps, in my view. But that was the ruling of this Court. If a conviction for shoplifting is not probative of mendacity, why is the fact that someone shoplifted proof of mendacity under Rule 608? Your Honor— In other words, I understand that there's a different rule with different principles, but the key to each of them in each case is that it's probative of dishonesty. And if we say that shoplifting doesn't come in under 609 because it's not about mendacity, I'm not sure I understand why that does not control whether it is evidence of mendacity under 608. Your Honor, 609 has a higher burden because it's an evidence of — it's extrinsic evidence of a person's conviction. It bears more weight. 608 is merely the government asking questions. Because that, at least, you know he really did it because he's been convicted. And it has a bigger effect on the jury. You're inquiring about the underlying — just the underlying conduct. Again, on your view of Schwab, whether or not he was ever convicted. And I understand he was convicted in this instance. Yeah. And, Your Honor, the government's questions are not evidence. So the government asked a question. The defendant denied it. And the government had no problem with the defense's request for a curative instruction that an arrest is not evidence. And the instruction was given that the government's questions are not evidence. So 608 is a fairly limited means of impeachment because the government is just asking a question. If the defense denies it, there's not any extrinsic evidence introduced. And the government didn't introduce any extrinsic evidence here. One more question. Since the trial, have you learned about United States v. Richter in 1987 and United States v. Truman in 1995, where we twice held that witnesses may not opine as to the credibility of the testimony of other witnesses at trial and, therefore, prosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper? Is this the first time you're hearing that rule? No, Your Honor. But I was not aware of it at the time. And the government concedes that that was— That was not objected to at all. I understand that as well. So there's one question here that goes to, should this conviction be reversed? But there's another question, it seems to me, that goes to what training is given in the United States Attorney's Office with respect to cross-examination and the various rules that control. And it's certainly my hope that something of this oral argument is reported back to the chief of the criminal division in order to take a look at how some of that training is done. I'll communicate that, Your Honor. Thank you. Thank you. We'll hear rebuttal. Thank you, Your Honors. I think that the unusual thing about this case is the number, the volume of evidentiary errors here about Mr. Glitz's testimony. The government concedes some of them, the one that Judge Lynch just addressed, the use of arrests repetitively through the testimony. And then there are these two other—well, really three other big ones, one that we haven't touched on, the use of—the questioning about the petty larceny conviction as if it was a grand larceny, the mistaken facts that the government asked Mr. Glitz about that testimony that just made Mr. Glitz look like he was totally incredible in everything he was saying, because he didn't even— He kind of is totally incredible in everything he's saying. Well, but he's not. He was right. Mr. Glitz was—that's the problem, right, Your Honor? Mr. Glitz was correct that he wasn't convicted of grand larceny. He was correct that it was one item that he was accused of taking and changing the price on, not the multiple items that the government said. But the jury didn't know that. The jury is just left with this overwhelming impression that nothing that Mr. Glitz is saying can be believed, which makes it impossible for them to believe what he is saying about the charges that he's actually facing. And this trial should have been about those charges, not about whether or not he committed a different crime that was very different in character and maybe exceedingly worse. Just Your Honor's reaction to stealing from a vulnerable old man and this volume of money shows how prejudicial those questions were. But with the mountain of evidence that was presented that he was deported to the Ukraine, if George Washington testified that they let him go, I just don't see how a jury could have believed that, even with all the errors you're talking about. I just don't see how it's not harmless with this mountain of evidence, especially the credit card, especially the credit card. Tell me why that credit card doesn't seal the deal. Your Honor, I agree that the evidence was strong in the government's case. Mr. Glitz had a response to the credit card. But the government put on a mountain of evidence that had nothing to do with those facts when they were cross-examining Mr. Glitz. He didn't stand a chance. And I think when the mountain of prejudicial evidence that shouldn't have been admitted is so great, that this Court should find that that's not harmless in a case that really was about credibility. Thank you. Thank you. Thank you both. We'll reserve decision.